## WALLACE v. OHIO VALLEY BANK.

### In re STAR CAR & FOUNDRY CO.

(Circuit Court of Appeals, Fourth Circuit. September 29, 1924.)

No. 2217.

**1. Corporations ⚖432(5)—Plaintiff had burden of proving president's authority.**

Where a bank charged to bankrupt corporation sums advanced to its president, claiming that it was by his direction, which sums bankrupt did not receive, the bank had the burden of proving the president's authority.

**2. Banks and banking ⚖116(2) — Creditor bank held required to credit bankrupt with a payment misappropriated.**

Where the president of bankrupt corporation and its treasurer, who was also vice president of a bank which held the president's personal note, without authority signed a check of bankrupt in payment of the note, for which bankrupt received no consideration, its vice president in such transaction acted for the bank, which is chargeable with notice of the facts, and must be required to credit the payment on an indebtedness of bankrupt to it.

**3. Bankruptcy ⚖345—Fraud of creditor, not affecting other creditors generally, not ground for disallowance of claim.**

That a creditor made false statements as to bankrupt's financial condition to one who afterward became a creditor does not entitle the trustee, representing creditors generally, to insist on postponement of the first creditor's claim until all others are paid.

Appeal from the District Court of the United States for the Southern District of West Virginia, at Huntington; George W. McClintic, Judge.

In the Matter of the Star Car & Foundry Company, bankrupt. From an order of the District Court, allowing the claim of the Ohio Valley Bank, George S. Wallace, trustee, appeals. Modified.

P. P. Gibson, of Huntington, W. Va. (George S. Wallace, of Huntington, W. Va., on the brief), for appellant.

H. Clay Warth, of Huntington, W. Va. (T. W. Peyton and John H. Holt, both of

Huntington, W. Va., on the brief), for appellee.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The appellant is the trustee in bankruptcy of the Star Car & Foundry Company, a West Virginia corporation. The appellee, the Ohio Valley Bank, claims to be a creditor of the estate. The three will be severally designated as the trustee, the bankrupt, and the bank. The bankrupt had a life of a little less than 18 months. When it was formed, it took over the assets and assumed the liabilities of the previously existing Ohio Valley Mine Car & Manufacturing Company. At that time the bankrupt planned to acquire in addition all the capital stock of the Star Manufacturing Company, a corporation engaged in the same line of business at New Lexington, Ohio. The last mentioned will be herein referred to as the Ohio company. Its merger with the bankrupt did not become legally complete. The bankrupt, it is true, obtained upwards of 80 per cent. of the common as well as of the preferred stock of the Ohio concern, but it never secured all of either. Each of the companies, closely allied with the other as it was, maintained its separate existence to the end, and they were wound up in distinct proceedings by different courts of diverse jurisdictions. One Shirer was president of each, and they had several other officers and directors in common.

The bank had been a creditor of the Ohio Mine Car & Manufacturing Company, whose debts the bankrupt assumed, and in consequence the bankrupt became its debtor. It claims to have made subsequent advances to the bankrupt, and it says at the time of the bankruptcy the bankrupt owed it upwards of $42,000, for which sum it filed its claim below, and to the allowance of which the trustee excepted.

Some of the exceptions at first interposed have since been abandoned, but the trustee still stands upon others. One of them alleges that the claim of the bank may not be allowed, unless and until it returns the sum of $2,611.58 which the trustee says it received from the bankrupt at a time and under circumstances which made it a voidable preference. It is sufficient to say that we agree with the referee and the court below in their holding that in this matter the trustee has not sustained the burden of proof the law imposes on him.

[1] His assertion that there should be deducted from the bank's claim the sum of $4,984.52 rests on different grounds. That amount is itself the aggregate of three separate items, no part of any of which the trustee says the bank had any right to charge to the bankrupt. The three notes or trade acceptances making up the total of nearly $5,000 were each given by debtors of the Ohio company to the latter, and were by it or by Shirer discounted at the bank, and by him placed to the credit of his personal account in the bank. The expert accountant, who made a careful examination of the books and accounts of the bankrupt, testified that no part of this money ever was received by the bankrupt, or was put to its use in any way. No attempt to contradict or explain this testimony has been made; nevertheless, when at maturity these obligations became in default, the bank charged them, not to Shirer, but to the bankrupt, because, as some of its officers testified, Shirer told them to do so. What justification he had for giving any such instruction does not appear. When the testimony in this case was taken, he was alive and residing in Ohio, where it would have been easy for the bank to have proved by his deposition what right, if any, he had to tell the bank to charge what appeared to be his debt to the bankrupt, but it did not do so. It was for the bank to prove that he was authorized to give such direction, and no such proof is forthcoming. As the record stands, the bank has not shown that these items were properly charged to the bankrupt, and the learned court below erred in overruling the objection of the trustee to their allowance.

[2] The trustee furthermore claims that $7,300 paid by the bankrupt to the bank should be credited by the latter to the former. So far as the record discloses, the history of this payment may be briefly stated. On February 10, 1921, Shirer as president of the Ohio company and in its name issued to himself in his individual capacity its demand promissory note for $11,300. He discounted it at the bank and had its proceeds there placed to his personal credit. Eleven days later $4,000 on account of this note was paid the bank. The balance remained unpaid for some months, and the bank became anxious enough about it to ask more than once for its repayment, and to reach an understanding with Shirer that, when the latter got some money he could spare, he would take it up. The active head

of the bank at this time was one Ferguson. He was its vice president, one of its directors, and on its discount committee. The president of the bank was a practicing physician, who could not give a great deal of his time to it. Ferguson was one of the original incorporators and directors of the bankrupt. On May 19, 1921, he was elected treasurer of the bankrupt, and continued to hold that office until it went into bankruptcy. He claims, however, to have known comparatively little about its affairs. The by-laws gave him the custody of all the funds and securities of the bankrupt, conferred upon him, when necessary or proper, authority to indorse on behalf of the company checks, notes, and other obligations and deposit the same to the credit of the bankrupt, and he or the assistant treasurer, jointly with such other officer as might be designated by the executive committee, might sign checks, drafts, and notes on behalf of the bankrupt. By virtue of his office as treasurer, he was also assistant secretary of the company.

Some time, apparently towards the end of May, 1921, Ferguson, as vice president of the bank and in its name, gave Shirer a letter of introduction to some banking people in Chicago, and Shirer went to Chicago for the purpose, it appears, of opening a line of credit with some Chicago banking institution. In consequence of this visit to Chicago, on June 1, 1921, the assistant cashier of Greenbaum Sons Bank & Trust Company, of Chicago, hereinafter referred to as Greenbaum, wrote to the bank, asking in confidence for any information that the bank might have regarding the character, financial responsibility, and general standing of the bankrupt. On the 6th of June, Ferguson in the name of the bank wired Greenbaum that the bankrupt was worth from $800,000 to $1,000,000, that it owned two plants, that both were unincumbered, and it was a safe risk, and on the same day wrote a letter stating that the bankrupt was organized in 1920, combining the two companies already referred to, that a statement of the company prepared by an accountant as of January 1, 1921, showed preferred stock, $419,700, which had been increased since that time by a comparatively small amount, 45,000 shares of common stock were outstanding, having no par value, and that the statement of assets and liabilities of the bankrupt showed this stock to be worth $20 per share.

Obviously, if these statements were true,

the surplus of the company as regards creditors exceeded $1,300,000. It said that the bank did not know what the company owed, but in comparison with its assets it was a comparatively small amount. It looked upon the bankrupt's paper as a perfectly safe risk, not only because of the property owned by it, but because the management was in the hands of experienced men. Ferguson signed this letter as vice president of the bank, but he did not say or indicate that he had any connection with the company. He testified he did not, because he assumed that everybody knew it. Subsequent to the receipt by Greenbaum of this telegram and this letter, it agreed to lend the bankrupt $80,000, $60,000 of which was at once placed to its credit. The first check drawn by the bankrupt on Greenbaum was for $7,300 to pay the balance of the note which had been discounted by the bank for Shirer personally. With reference to this check, Ferguson says that, when he found that Shirer had returned from Chicago, he (Ferguson) stopped at Shirer's office and asked the clerk to prepare a check, which was done, and Shirer, as president, and Ferguson, as treasurer, signed it. Ferguson was asked whether he regarded this note for $7,300, for which the check was given, as a liability of the bankrupt. His only reply was: "We understood they were going to pay it." It does not appear that either the bank or Ferguson made any inquiry as to why the bankrupt undertook to answer for what was Shirer's obligation. As the record stands, the bankrupt's money was applied by the bank to the payment of a debt due by Shirer to it, and there is no evidence that anybody connected with the bankrupt, other than Shirer himself and Ferguson, knew of or consented to this application of its funds.

We think that the trustee rightfully insists that the bank must credit this $7,300 upon its claim against the bankrupt. In so holding we have not lost sight of the fact that in its brief the bank says that if Ferguson, to promote some private end of his own, conspired with Shirer to do an improper thing, the knowledge he acquired as such coconspirator could not be imputed to the bank. Sound as the proposition of law is, it has no relevancy to the facts disclosed by this record. There is nothing here shown to raise even a suspicion that Ferguson, in what he did in connection with this check, was seeking anything personal to himself. It is clear that in getting it he was acting

for the bank, and what he knew concerning it the bank must be held to have known; that is to say, when the bank received this $7,300 from the bankrupt, it knew that the check was in payment of the note which Shirer personally owed to it. It had no reason to believe that any officer of the bankrupt, except Shirer himself and Ferguson, who in this matter was acting for the bank, as he himself in fact testified, knew that its money was being used to pay its president's personal debts. If in point of fact the proceeds of this note had gone to the bankrupt, or if it had authorized the payment, the fact could have been shown but it was not. As the record stands, the bank must account to the trustee for the $7,300; that is to say, it must treat that sum as a credit on its claim against the bankrupt.

[3] Another of the trustee's exceptions goes to the entire claim of the bank. It alleges that the bank, for the purpose of getting undeserved credit for the bankrupt, knowingly made false statements as to the latter's financial condition, and that those to whom they were made acted upon them and suffered thereby. The trustee argues that in consequence the bank is not entitled to receive anything from the bankrupt estate until after its other creditors have been paid in full. To sustain this exception the trustee relies upon the telegram and the letter sent by the bank to Greenbaum, and as we understand the record upon them alone. If they made the bank liable to any one, as to which we intimate no opinion, it was to Greenbaum. If any one was deceived by them, it was Greenbaum, and it alone suffered from them. The money the bankrupt obtained from it went to swell the bankrupt's resources, and to a greater or less extent benefited the bankrupt's other creditors. As representing them, the trustee has not been hurt. Doubtless a case can be conceived in which a creditor of a debtor in failing circumstances may for its own purposes seek by knowingly false statements to obtain credit for the debtor from any or from all who may deal with the latter. Under such conditions it may be that the trustee, as representing the creditors generally, has the right to insist that, in the distribution of the bankrupt's estate, the improper action of the one creditor shall estop it from competing with its victims; but such rule of law, if it exists, has no application to the instant case. The learned court below was right in overruling this exception.

From what has been said it follows that the exceptions of the trustee to $12,284.52 of the bankrupt's claim—that is to say, to the two sums of $4,984.52 and $7,300, respectively—should have been sustained, and that there was no error in overruling his other exceptions. In short, the claim of the bank should have been allowed for $30,253.43, and not for $42,537.95.

Modified.